Good morning, Your Honor. Good morning, Honorable Court. Randall Hammoud, representing Mr. Cother. Good morning. Randall Hammoud, representing Mr. Cother. I think the important beginning in this case is to understand that his testimony is deemed to be credible because the administrative agency, the BIA, or Board of Immigration Appeals, and the immigration judge did not find to the contra. And under the authority of KROTOVA, K-R-O-T-O-V-A v. Gonzales, 416 Fed 3rd, 1080 at 1084 absent, any BIA adverse credibility determinations, applicants, factual contentions are deemed to be true. That's the case that we face here. And what we have here is we have a Lebanese national who's a Sunni Muslim who's been engaging with Syrian forces in Lebanon. Well, that's kind of a generous statement. Well, I believe that his testimony... His testimony was when he came through the checkpoints... His testimony was... They were a little, how would we say? I can't say that they beat him every time they had an encounter with him, but they were... They don't even know who was in charge, should we say. Well, the Syrians tend to do that, Your Honor. But what happened with him was in the 1980s when he was still young, before he left for education, he was taken into custody by the Syrians. His name was taken down. He was identified as a potential person of value to them. He denied attempts at that time to make him an informant. Well, where's the persecution? The persecution would be on the grounds of his political opinion because he stated to the Syrians... Well, what harm did he suffer? The harm he suffered, basically, is that he was threatened by Syrian military forces. His name was taken by them. And in such a scenario as that, that can be sufficient to establish persecution. What's your best case that says that threats alone are sufficient? Babila, 367 Feb. 3rd at 1074. Even without physical harm, threats can be sufficient to establish persecution. Is that Babila? Babila, yes. Babila is a little bit different. Well, every case is a little bit different, Your Honor. But similar to that would be Gual versus Ashcroft. There was some physical harm there, but not the kind of physical harm that others have suffered in the term of definition of torture or, quote, persecution per se. But even the fact of threats with stating to the person, we have your name, can constitute persecution under Najunga versus Ashcroft, 374 Feb. 3rd at 772 to 773. And I think, you know, the Syrians are basically designated as a terrorist state. They've been terrorizing Lebanon. They were terrorizing in 2005 when these briefs were submitted. And they continue to terrorize Lebanon in the sense that, although they've formally withdrawn forces from the country, they still have a perverse and pervasive influence in Lebanon and are suspected of killing nine parliamentarians who are anti-Syrian between 2005 and today. Does it weaken your position and your view? Is it something we should maybe ignore? How long they had him on this list and what they did to him in the interim? I think that's important as to how long they had him on the list, because every time he encountered a checkpoint, he was taken into secondary and he was basically... They put him on the list. They knew exactly where to find him. And how many years passed? Well, they didn't know where to find him because most of the time he was out of the country. He was in Dubai. How many years passed from the time they put his name on the list until his action? Well, in the 1980s, when they put his name on the list, he had several encounters with them then. Almost 30 years. No, in 1999, they also stopped him when he was there at the checkpoint. I know, but they first put him on the list, I guess, back in the 1980s, didn't they? Yeah, but when it's a terrorist regime... They didn't do anything to him between then and now. Nothing's been done to him. They haven't had the opportunity because he's here and he's been mostly gone. But if a terrorist regime has your name on a list, then your name is on the wrong list, Your Honor. I think the court could almost take judicial notice of that. And I think in this situation, we're talking about a terrorist state trying to exercise complete influence over the country of Lebanon. They were doing that in 2005 and they persist in doing it today. It's a dangerous place. And also, he did indicate during his stop that he's a Sunni Muslim. The Syrians are basically controlled by the Alawite sect of the Shiite sect. And the court can even judicially notice the reality of today is that there's been total ethnic cleansing throughout Iraq because of the Shiite-Sunni dichotomy, unfortunately and tragically for all concerned. And this man is a Sunni and he's in, basically, Lebanon, where the Shiites are trying to extend their influence through Hezbollah and through the Syrian forces through very nefarious means. As we stand here today, the Hezbollah forces have basically surrounded the government in Beirut and there's been a total disengagement of the political process and a verge, basically, of another civil war, possibly, with complete Syrian involvement. Under the radar, supposedly, but Condoleezza Rice has accused the Syrians of interference and has even told them to knock it off in September of 2007 when they killed the most recent parliamentarian who died by a vicious car bomb. And she told them to knock it off even before that in June 21st of 2005, accusing the Syrians of interference in Lebanon. And then in 2007, the United States imposed sanctions and President Bush condemned the killing of the parliamentarian. Syria is very active in Lebanon, even more active, I submit, than they were in 2005. And this man has protested to his detainers, the Syrian personnel who took him into custody, that he's basically, he's Lebanese and he told them he doesn't like what's going on in Lebanon, but he can't go too far without suffering further abuse. Yes, Your Honor. No, Your Honor. No, Your Honor, this is strictly about withholding. Right, and on the withholding, I'd just like to state that although the tests seem to be more likely than not, the test really is, the preponderance of the evidence is defined by CUP, K-H-U-P versus Ashcroft, 376 Fed Third at 905 to 906. The same for the C-A-T argument. We're talking about a preponderance of evidence and the question is, is there a preponderance of evidence that if this man goes back to Lebanon, he'll either be tortured or intimidated or persecuted by the Syrians because his name has been on their list for quite a while. Okay, do you want to save some time for rebuttal? Yeah, I think I would like to do that, Your Honor. You've got two and a half minutes. Thank you, Your Honor. Let's hear from the government. Good morning, Your Honors. May it please the Court, I'm Carl Gellert on behalf of the respondent, the Acting Attorney General. I guess I'll start by addressing a couple of factual questions the Court had. Judge Ferris, you asked when his name was first put on the list. His testimony was that prior to leaving Lebanon in 1980, he was stopped four or five times, and he said at that time they put his name on the list. So it was about 20 years that his name was on the list when he was stopped in 1999. And Judge Pius, you asked, I think, the question that really goes to the heart of this case, which is, does the testimony he gave regarding being stopped at the checkpoints really amount to persecution? Or rather, because of the standard review here, does it compel the conclusion that it was persecution? And he claims he went back to Lebanon seven times between 1985 and 2000, and he was detained twice, slapped a few times, hit with a rifle butt once, and they tried to steal his car twice. And he told them they couldn't have it, and he eventually let them go. So that evidence doesn't compel the conclusion that the Immigration Judge was wrong to say that his fear that he would be caught if he returned to Lebanon was unfounded, because they had taken him into detention a couple of times. His name had been on the list for a long time, and each time they just let him go. We're just focusing on Napoleon and Catherine. Your Honor, when we filed the briefs in this case, it was prior to this Court deciding the Ramadan case. And in Ramadan, the Court has now held that this Court's review of issues of law include mixed questions of law and fact when there is undisputed facts. So this Court would have jurisdiction to review the finding of untimeliness if it were challenged here. I could address some of those issues if you want. Mr. Hammoud hasn't challenged them, but I could address them. But this Court has said that it has jurisdiction to address those if they're raised. So what's the standard for withholding? What does the claimant have to show? The claimant has to show a clear probability that he will be persecuted if he's returned to the country, and here it would be Lebanon. And so that's more likely than not that there's a clear probability that he is going to be, and the statute uses the term, his life or his freedom is going to be threatened. Obviously, if he could show persecution, being jailed, beaten, those sorts of things, those are the sorts of things that courts have found to constitute persecution. But in this case, all you have is a short detention, some minor physical abuse, and his being released. And I just want to touch on briefly the issues that Mr. Hammoud raised about what has happened since 2005. Obviously, under the statute, this Court's jurisdiction is limited to the administrative record. There are some exceptions to that this Court has recognized, but certainly anyone who reads the newspapers knows there's been a lot of changes in Lebanon. If Mr. Hammoud believes that there are facts that support his client's position, obviously, he has the opportunity to file a motion for rehearing if he thought that there were facts that support him. And obviously, if he were to do that, the government would have to take a look at it to see what... He could file a motion to reopen on grounds of changed country conditions. Correct, Your Honor. There's no time limit. Correct. If there were, for example, some evidence that there was attacks on Sunnis or something like that, I will say, if you read the country reports, it's unclear that there are those facts out there. But obviously, if he has some... That's correct, Your Honor. And the question would be whether they're better now than they were in 2000. And obviously, since the Syrian army has departed, that would change whether or not he has a well-founded fear of persecution if he returns. But as I said, obviously, if he wants to make that record, he can move to reopen before the board. If the Court doesn't have any other questions, I think the issues are well addressed in the brief, and the evidence does not compel the conclusion that he was entitled to relief. So thank you very much. Thank you. Two and a half minutes, right, Your Honor? Right. Thank you, Your Honor. I think counsel mentioned the stealing of the car, but I think that scenario could be dispatched by offering the scenario that there can be a mixed motive persecution as well. They didn't steal the car. They attempted to. He said, no, you can't have it. And he resisted them, too, Your Honor. And when you resist, that makes it even worse as far as potential persecution. He resisted the authorities. And I think that shows there is a mixed motive impetus for persecution at that point, according to Navas, NAVAS 217, Fed 3rd, at 655 to 656. Has he filed a motion to reopen based on change of conditions? He has, and, Your Honor, because as far as we're concerned, the conditions are as bad or worse than they were, or the same, right, as they were in 2005. According to the Syrians of Lebanon. Yeah. One would have thought, I'm not being pejorative at all, that possibly the government would have filed a motion for change of conditions to the better, but I think the reality of Lebanon is that they're not better. They're the same or worse. And with respect to the asylum, we did not brief that, and we did not argue that issue about the tardiness or timeliness of the asylum issue. And I think this court also can judicially notice facts, and not necessarily remand if the court feels the facts are such that make things worse. Under Garford v. INS, 231, Fed 3rd, 645, at 654 to 656, the court there distinguished away the earlier authorities of Fisher, 79, Fed 3rd, 955, and stated that if there's a change in the country conditions that were not manifest or submittable to the BIA to the court when the briefing was done, then this court has the authority to take notice of those facts and render a decision accordingly, and not necessarily remand and not necessarily look to counsel to reopen to the BIA. This case is basically, I think, a case of threats of intimidation by, you know, a terrorist state of a person in his country that the terrorist state continues to consider to be a province of Syria, and this man was tempted to be brought into line, and he resisted, and he faces persecution if he were to return. And on that, in my comments, and I thank the court for its time. Thank you. Thank you.
judges: Farris, Paez, Conlon